CARLONE, Plaintiff in error, vs. THE STATE, Defendant in error.

*April 27—May 14, 1912.*

*Criminal law: Homicide: Degrees: Murder in second degree: Man-slaughter: "Heat of passion:" Evidence: Sufficiency: Instruc-tions to jury: Harmless errors.*

1. Where, upon his own testimony, accepting it as true, the accused should have been convicted, as he was, of murder in the second degree, he was not prejudiced by an incorrect definition, in the charge, of manslaughter in the fourth degree.

2. To bring a homicide within the third degree of manslaughter as defined in sec. 4354, Stats. (1898), it is not sufficient proof of "heat of passion" for the accused merely to testify that he was exceedingly angry or passionate at the moment in question, but such testimony must be supplemented by proof of facts and circumstances showing such provocation as would ordinarily produce heat of passion.

3. Where a middle-aged man, a member of a gang of section work-ers on a railroad, had locked out of a box car in which they slept a boy about sixteen years old who was in the habit of re-turning to the car after the others had retired and disturbing their rest, and in the quarrel which followed the boy, although he was in no personal danger and there was nothing to indicate that the man intended any harm to him or to put any great affront upon him, procured a rifle and either shot at the man or, as he testified, attempted to "shoot past him" and scare him, and in so doing killed another person in the car, he was guilty at least of murder in the second degree.

ERROR to review a judgment of the circuit court for Bay-field county: JOHN K. PARISH, Circuit Judge. *Affirmed.*

*John Walsh,* for the plaintiff in error.

For the defendant in error there was a brief by *E. C. Al-vord,* district attorney, and the *Attorney General* and *Russell Jackson,* deputy attorney general, and oral argument by *Mr. Alvord* and *Mr. Jackson.*

TIMLIN, J.    The accused was informed against for murder in the first degree, convicted of murder in the second degree, and sentenced to the state prison for a period of fifteen years.

(1) It is contended that the court below, in its instructions to the jury, erred in defining manslaughter to be "an involuntary killing of another by any weapon or by any means either cruel, unusual, or in the heat of passion." (2) Also in refusing to instruct the jury that they might find the defendant guilty of manslaughter in the third degree as defined by sec. 4354, Stats. (1898).

In order to ascertain the legal sufficiency of these assignments of error we must refer to the evidence. The accused was a boy about fifteen or sixteen years of age, worked at section work on a railroad with Nick Alberico, a boy of his own age, Joseph Alberico, the father of Nick, and Salvator Riconsona. They lodged together and prepared their meals in a box car left on the west side of the railroad tracks and a little to the north of Drummond station. In this car were beds and cooking utensils. The car had a sliding door in the center on each side. The accused was accustomed to go out of the car after supper and remain out some time and return about 9 o'clock at night. The other occupants of the car, who usually locked the car door from the inside and retired early, were apparently dissatisfied with such conduct on the part of the accused, which interrupted their rest and required them to either leave the car door open when they retired to their beds for the night or get up and open the door to let the accused in on his return. On the night of the homicide Joseph informed the accused that he better come back before 9 o'clock because he, Joseph, would not keep the car door open until 11 or 12 o'clock every night. The accused made no answer but went away as usual, returned about half past 9, found the car door locked, shook it, and demanded of Joseph that he open the door. There is some conflict in the testimony as to what then took place. But it seems to us there was nothing more than an ordinary verbal quarrel and a threat on the part of Joseph to lock the accused out. Joseph was barefooted. The accused claims that Joseph kicked at him or kicked him and swore at him, but this is denied. Joseph, however, did lock him out

and apparently retired for the night. The accused went some distance to a tool car, procured a lining bar and a rifle which he found in the tool car, laid down the rifle at some distance from the door of the car in which his comrades were, and attempted to force open this door with the lining bar. He claims he heard some noises inside as if Joseph was getting an ax. Joseph, hearing the attempt to force open the door, came, together with his son Nick, to the door and pushed it partly open and stood in this entrance unarmed and partially undressed. His son Nick stood beside him and partially behind him. Accused went back to where he left the rifle, shot at Joseph, and killed Nick instantly. Accused testifies that he did not intend to kill either of them, but tried to shoot past Joseph so as to scare him, and at no time had any thought of killing or shooting at Nick. When accused seized the rifle and fired the shot in question he was at a safe distance, there was no assault or other injury impending against him, neither Joseph nor Nick had made any move to descend from the car, and after firing the fatal shot the accused fired two more shots through the car. Joseph, seeing that his son was shot down, leaped out of the car and ran toward the accused, who dropped the gun and took to flight. Accused testifies also that he was crying and that he was very angry. He was arrested afterward and told the officer that he intended to kill Joseph but not Nick, and that he would kill the whole family. Afterward while he was in jail awaiting trial he wrote a letter stating: "I went down to the car house and then I got the rifle and I went back to kill his father and I missed him and I killed the boy."

With reference to the errors assigned. The accused was in no wise prejudiced by the incorrect definition of manslaughter in the fourth degree. Under the definition given the court would permit the jury to reduce the homicide to manslaughter in the fourth degree, even though the killing was cruel or unusual or in the heat of passion. The accused was entitled to

no such exemption from the consequences of his act, and the jury by finding him guilty of murder in the second degree very properly refused to consider the crime of manslaughter even as thus liberally defined.

The statute (sec. 4354, Stats. 1898) defining the third degree of manslaughter is as follows:

"Any person who shall kill another in the heat of passion without a design to effect death, by a dangerous weapon, in any case except such wherein the killing of another is herein declared to be justifiable or excusable, shall be deemed guilty of manslaughter in the third degree."

There is no evidence in this case to bring the homicide in question within the third degree of manslaughter as thus defined. It is not sufficient proof of heat of passion for the accused to merely testify that he was exceedingly angry or passionate at the moment in question. Such testimony must be supplemented by proof of facts and circumstances showing such provocation as would ordinarily produce heat of passion. *Ryan v. State,* 115 Wis. 488, 92 N. W. 271; *Johnson v. State,* 129 Wis. 146, 108 N. W. 55. These circumstances are entirely wanting in the instant case. The quarrel which resulted in the homicide was a very ordinary dispute between a hardworking middle-aged man who desired rest at night after his day's labor and a boy who was anxious for pleasure or excitement. Aside from locking him out of the car there was nothing to indicate that Joseph or those with him intended any harm to accused or to put any great affront upon him. Petty disagreements of this kind cannot be settled with a rifle. Nor can a person in no personal danger and subjected to no extraordinary provocation have recourse to a lethal weapon and take human life and then mitigate the offense by his own statement of his causeless anger or passion. Besides, the accused went on the stand and testified that he shot by design, that is in the endeavor to shoot "past" Joseph and scare him. This is inconsistent with heat of passion. But it is absolutely

consistent with murder in the second degree, because the homicide was perpetrated by an act imminently dangerous to others, evincing a depraved mind, regardless of human life, without any premeditated design to effect the death of the person killed or of any human being. Upon the testimony of the witnesses for the state the accused should have been convicted of murder in the first degree. Upon his own testimony, accepting it as true, he should have been convicted, as he was, of murder in the second degree. The time is gone by, if it ever existed, when technicalities or unnecessary refinements can be allowed to stand in the way of the vindication of the law or the punishment according to law of those unquestionably and legally guilty of murder.

*By the Court.*—Judgment of the circuit court is affirmed.