Van Rite, Plaintiff in error, vs. The State, Defendant in error.

*December 6, 1940—March 11, 1941.*

For the plaintiff in error there was a brief by *Classon &* *Ballman* of Green Bay, and oral argument by *Richard J.* *Ballman.* *Isadore G. Alk* of Green Bay of counsel on the brief on motion for rehearing.

For the defendant in error thére were briefs by the *Attorney* *General, William A. Platz,* assistant attorney general, *Cletus* *G. Chadek,* district attorney of Brown county, and *Richard* *J. Farrell,* assistant district attorney, and oral argument by *Mr. Chadek, Mr. Farrell,* and *Mr. Platz.*

The following opinion was filed January 7, 1941:

MARTIN, J.   The evidence shows that in September, 1936, the plaintiff in error, hereinafter referred to as "defendant," was employed as a domestic in a home in the city of Green Bay.   On September 27, 1936, she left her place of employment stating that she was going to visit a sick sister in California.   On the same date she registered at the Bellin Hospital in the city of Green Bay under an assumed married name.   She gave birth to a normal male child on September 28th.   She was discharged from the hospital with her baby on October 8th.   A few days later she returned to her former place of employment.

On March 6, 1940, the dehydrated body of the child was found in a satchel in the basement of the home in which she was employed in September of 1936 and where she remained as a domestic until June of 1938. External and X-ray examinations of the child's body by a pathologist revealed no injury. Medical testimony on the trial was to the effect that the child had died of suffocation.

After questioning by police officers on three or four different occasions, defendant admitted (orally and in writing) that the dead child was hers, that it had died in the satchel where she had placed it with the intention of killing it. She made the same admissions to two physicians while they were engaged in making a mental and physical examination of her at the request of the district attorney. On the trial she denied any intention to kill the baby, denied she had confessed killing it, and claimed that her confessions were not voluntary. She admitted that the child had died in the satchel after she had placed it there in a rooming house where she had stayed after leaving the Bellin Hospital prior to returning to her former place of employment. She testified that when she left the hospital at about 8:30 p. m. on October 8th, she had the child wrapped in a blanket and had her wearing apparel in the satchel; that she took a cab from the hospital to the rooming house; that after she left the cab, she went into a park near by where she sat approximately an hour; that while in the park she put the child in the satchel and then went to the rooming house; that when she got to her room she opened the satchel, nursed the baby, slept with it that night, and the following morning she again placed the child in the satchel, leaving it partially open, and placed it on the bed; that she then went out to get something to eat and to look for a place with accommodations for light housekeeping; and that when she returned to her room at about 12:30 she found the child dead.

The landlady of the rooming house testified that she went into defendant's room on the morning of October 9th to make the bed; that she found the bed had been made; that the satchel was on the floor back of the bed, and that if it had been left open she would have seen it. She said if it was open, it was open a very little.

Defendant's confessions to the police officers and to Drs. Kelly and Jordan were properly received in evidence. It appears that the first investigation made by the police officers, on March 11, 1940, was made in an effort to trace the parentage of the child. At that time defendant denied having any knowledge as to the paternity of the child. On April 18, 1940, the police officers closely examined the defendant in respect to the parentage and death of the child. Prior to this examination, defendant was informed of her constitutional rights, and throughout the examination she again denied any connection with the child. During this examination by a police officer, he made reference to a certain De Pere girl who had been accused of concealing the birth of an illegitimate child, and who had been placed on probation. Referring to the De Pere girl the police officer stated:

"This girl was used just as right as we possibly could under the circumstances, but she told the absolute truth after we got her in here, and that is what I am expecting of you. I don't care whether this is your baby or not, I want to know, and I want the truth."

On April 22d defendant was again examined at the police station at great length. She was not then under arrest. She was advised of her constitutional rights and informed that anything she might say could be used against her. The De Pere girl's case was again mentioned by the examining officer. He said:

"That girl feels better today, she feels ten times as good now that it is all cleaned up and is serving her sentence and

we have been fair with her. And you can feel that same way, you will never be the same Loretta and until you tell the truth and clean it up you can never feel the same. You cannot go on holding that in you and believe in yourself if you do not release that. You know what is going to happen eventually, you'll be taken out to Oshkosh. You may have had a reason for doing what you did, I'm not saying that, but if there are reasons tell us. We thought this other case was murder but when we got into it it was different. Loretta there is no reason why you can't tell the truth and face the music, I think you have the stuff in you to do it."

It further appears that in connection with the officer's examination on April 22d, he called her attention to discrepancies which he found when he checked up on the statements made by her on March 11th and April 18th. The following questions and answers are taken from the statement of April 22d:

"*Q*. Why don't you tell the truth? *A*. I'm telling the truth.

"*Q*. I hate to say it but you are not, we have taken a statement from your parents and we know that you are not telling the truth? *A*. I am telling the truth.

"*Q*. Then are your parents lying, would you say that? *A*. No.

"*Q*. Then why all the discrepancies, your parents did not take you to go and see Marie because she was sick, we have been fair with you Loretta and we will be and continue to be if you co-operate. It is not a pleasant thing for us, I can appreciate your position and can appreciate what you have gone through, now I wish you would co-operate so we do not have to question you and get tough with you. We do not know maybe the child may have been dead, it may not be as tough as you think, nevertheless our records are charged with it and we have got to clean it up and suspicion is absolutely on you Loretta. We have made an extensive investigation from St. Mary's Home on. Be honest with us and I'll assure you we will go as far as we can with you? *A*. I am being honest."

She was a witness in her own behalf. Her testimony on the trial is in substance the same as her confession of April 22d with the exception of her denial of having admitted that she intended to destroy her child and that she knew the child would die from suffocation if she closed the satchel. She also denied having admitted that she had not nursed the baby after she left the hospital. She did not testify that her confession was not made voluntarily. She testified that she thought she was confessing to being the mother of the child, and that she had put it in the satchel, and that she had concealed the satchel in the basement of the home where she was employed as a domestic, where it was found on March 6, 1940.

It will serve no useful purpose to set out in detail the whole story of defendant's confessions. She did confess to the officers during her examination on April 22d and to Drs. Kelly and Jordan on April 23d, that she did not nurse the baby after leaving the hospital on the evening of October 8th; that the child had no food after leaving the hospital, and that she knew the child would die of suffocation if she placed it in the satchel; that she knew the child could not live without food. She was asked:

"Q. Loretta, why did you kill this baby? Did you think it was in your way? A. No.

"Q. What was your reason for doing that? A. I can't explain why I did it."

When the confessions were offered in evidence, at the request of the defense counsel, the court excused the jury and received evidence with reference to the nature of and the manner in which the confessions were obtained. The court held that the confessions were admissible, and same were submitted to the jury under correct instructions. This was the proper procedure. *Hintz v. State,* 125 Wis. 405, 104 N. W. 110; *Tarasinski v. State,* 146 Wis. 508, 131 N. W. 889; *Sweda v. State,* 206 Wis. 617, 621, 240 N. W. 369.

While defendant claims that the court erred in allowing the confessions to go to the jury, it is not claimed that there was any error in the instructions given in reference thereto.

Defendant contends that the court erred in submitting murder in the second degree and further erred in not submitting manslaughter in the fourth degree. Defense counsel insisted that only two verdicts be submitted, that is, first-degree murder and a verdict of acquittal. After a careful examination of the evidence we are convinced that the evidence not only sustains the verdict of second-degree murder, but that if the jury had believed that defendant had formed the intent to destroy her child, the evidence would sustain a conviction of first-degree murder. It is also true that if the jury believed the defendant's testimony as given by her upon the trial, there would be a basis in the evidence for a verdict of fourth-degree manslaughter. Had there been a request for the submission of a verdict on fourth-degree manslaughter, it would have been error to have refused same.

"Of course, if there was no request, on behalf of defendant, for the submittal of lesser degrees of the offense, then the court's omission in that respect does not constitute error of which defendant can complain." *Sweda v. State, supra,* p. 625, and cases cited.

In the instant case the court, having submitted only murder in the first and second degrees, instructed the jury that if it did not find defendant guilty of either degree of murder, a verdict of acquittal should be returned. In *Sweda v. State, supra,* p. 625, the court said:

"The instruction given to the effect that defendant was guilty of murder in the first degree, or not guilty, is favorable rather than prejudicial to the accused, if there was any evidence on which he might have been convicted of the lesser offense. Having had the advantage of that favorable situation, and acquiesced therein by omitting to request the submittal to the jury of lesser degrees, defendant cannot sub-

sequently, upon conviction, predicate reversible error because of an omission which before the return of a verdict appeared to be to his advantage."

In *Hempton v. State,* 111 Wis. 127, 139, 86 N. W. 596, the court said:

"It has often been held that where the jury are instructed, in effect, that the accused is guilty of some one of the higher degrees of criminal homicide, or not guilty, if error is thereby committed in that the evidence would admit of a conviction of some lesser degree of homicidal offense than the degree or degrees submitted, the error is favorable rather than unfavorable to the accused." (Citing *Dickerson v. State,* 48 Wis. 288, 4 N. W. 321; *Winn v. State,* 82 Wis. 571, 52 N. W. 775; *Fertig v. State,* 100 Wis. 301, 75 N. W. 960.)

The defendant assigns errors as to the admission and rejection of certain evidence and as to the court's refusal to give certain requested instructions. Error is also alleged because of the refusal to grant a new trial for alleged prejudicial remarks of the prosecuting attorney and the trial court. We have carefully considered all of the alleged errors and are of the view that no error was committed in these respects.

*By the Court.*—Judgment affirmed.

A motion for a rehearing was denied, without costs, on March 11, 1941.