DEVROY, Plaintiff in error, vs. THE STATE, Defendant in error.

*December 5, 1941—January 13, 1942.*

G. F. *Clifford* of Green Bay, for the plaintiff in error.

For the defendant in error there was a brief by the *Attorney General, William A. Platz,* assistant attorney general, and *Donald W. Gleason,* district attorney of Brown county, and oral argument by *Mr. Platz.*

FRITZ, J. On a trial of the prosecution which resulted in the judgment under review, the jury found Joseph Devroy, the plaintiff in error, guilty of murder in the first degree for killing Emily Kaiser on July 25, 1939. On that day Devroy went to the premises where his wife, Lena Devroy, lived with her mother, Emily Kaiser, and there killed both of them with five shots fired by him with a revolver. The jury's verdict was well warranted by the evidence, and the conviction must be sustained unless error, affecting substantial rights of the defendant, occurred on the trial in the respects hereinafter considered. No useful purpose will be served by a detailed statement of the facts, excepting in so far as they are involved in passing upon the errors assigned by Devroy in this court.

His first assignment of error is that the court erred in denying his request to submit to the jury the issue of manslaughter in the third degree. That request was denied on the grounds that the evidence did not admit of finding that the killing was "in the heat of passion" and that it was "without design to effect death." Evidence reasonably admitting of findings in each of those respects was necessary to constitute the killing but manslaughter in the third degree under the definition thereof in sec. 340.18, Stats.; and in the absence of evidence

to establish such findings, the only forms appropriate for a verdict herein were those submitted by the court, viz., "Not guilty, because insane at the time of the commission of the crime;" "Guilty of murder in the first degree as charged;" "Guilty of murder in the second degree;" and "Not guilty." In passing upon the assignment of error in question there are applicable the rules that—

"to justify a conviction, and submittal for conviction of a lesser offense included within the greater, 'there must be some reasonable ground on the evidence, in the judgment of the court, for a conviction of the former and not of the latter.' In the final analysis of the evidence, the test to be applied, in determining whether lesser degrees of the offense charged are to be submitted on request, is whether in any reasonable view of the evidence there is reasonable ground on the evidence, in the judgment of the court, for a conviction of the lesser offense and not the greater." *Sweda v. State,* 206 Wis. 617, 625, 240 N. W. 369; *Hempton v. State,* 111 Wis. 127, 140, 86 N. W. 596; *Weisenbach v. State,* 138 Wis. 152, 119 N. W. 843; *Krueger v. State,* 171 Wis. 566, 578, 177 N. W. 917; *Meyer v. State,* 176 Wis. 184, 187, 185 N. W. 520.

On behalf of Devroy it is claimed that the killing of Emily Kaiser was in the heat of passion could be inferred by the jury from evidence to the following effect. Emily Kaiser had led Devroy's wife into a life of crime, had a bad influence upon her, and was taking her away from him and keeping her in a life of crime. He was a law-abiding citizen and using every effort to make his wife behave and still loved her and was always very good to her; and in endeavoring to get her to abandon her improper conduct, was taking drastic measures to prevent the renewal of a tavern license to her by a town board. There was also considerable bitterness because he believed that through the efforts of Emily Kaiser he had been gotten to deed property to his wife, which he was told subsequently he could not have returned to him because he had claimed, in going through bankruptcy, that he owned no prop-

erty. In spite of his efforts to prevent his wife from living a criminal life, she left their home and lived with Emily Kaiser, who thereby frustrated his plans to his bitter disappointment. A few days prior to July 25, 1939, he entered Mrs. Kaiser's house against her will and found his wife sitting in a room with another man and found also a couple sitting on a bed in another room; and in speaking about this to others he stated that if he had been there an hour later he would have caught his wife in bed with another man. About 11 a.m. on July 25, 1939, there was served on Devroy a complaint for a divorce in which it was stated that he was the wrongdoer and had only $283 worth of property; and that there should be taken away from him the property,—of which he believed half to be his and that he had been swindled out of it through Emily Kaiser. With this complaint there was served also an order requiring Devroy to vacate the property which he considered his own place, and to turn the keys over to the deputy sheriff who served the papers. This constituted such a climax to him that he sat down and put his head between his hands and said to the deputy, "God, man, do you realize what they are doing to me? . . . Come on I want to show you what they are taking away from me." Then he induced a friend, Fred Calmus, who was present when the papers were served, to accompany him in his automobile to Emily Kaiser's home to try to effect a reconciliation. Calmus went alone to her door and she asked what he wanted, and he replied that Devroy wanted to see Mrs. Devroy. Emily Kaiser replied that he could not see anybody,—"Joe is crazy;" and that was communicated to Devroy by Calmus upon returning to the automobile. In returning he walked through an alley and was met by Devroy, who was driving in such high state of nervousness and so excited and irritable that he nearly ran over Calmus. About 3 o'clock that afternoon Devroy went to the Kaiser premises and there shot and killed his wife and her mother. He then drove from her residence in the city of Green Bay to a farm

on which his sister and mother resided. En route he stopped off to write a note, which reads:

"Well it to bad, writ, it all over, our troubles are ended, if she hadent sneaked out for the last ten years after twelve and one o'clock in the night, everything would have been all right, but she was not satisfied, so she turned out to be inmate at her mother running house ill fame at 514 Mather. So both our wishes are to be creamted and our ashes put in a sauvener casket and have Deyone at the Brown county airport to straw the ashes over our field. Lot of people thinks that a man must be insane to thinks like this but they are wrong. It is merely to bring justes to the family, not put them under shame—the girls that has worked here, they can tell wan all about it. So by, by Merrina and Ray."

He also stopped at a tavern where he was seen by a boy who testified on the trial that he noticed that there were beads of sweat on Devroy's forehead; that his eyes were round, staring, glassy, and he did not recognize the boy although he knew him well; and that he showed evidence of rage, fear, confusion, and mental disturbance. At his sister's farm Devroy talked excitedly to his mother and kissed her and then ran out of the house; and about the time police officers arrived, he ran into a cornfield and shot himself, when an officer commanded him to surrender.

On the other hand there are, however, also the following facts established by evidence without any material contradiction. After Calmus had returned and told Devroy about Emily Kaiser's reply to his request to see Mrs. Devroy, Devroy drove the automobile to where Calmus desired to get out. Subsequently Devroy drove to the home of his married daughter and visited with her for about twenty minutes. He inquired how she and her husband were getting along with an addition they were building to their house, and asked when she last saw his wife and how she was and whether she was still staying at "grandma's." While his daughter was wash-

ing the luncheon dishes he played with her two children, and had the youngest child on his knee, and the oldest child climbed in his lap and asked for candy and he said, "He had none, but was going to town and would get some." During all that time he appeared to be normal, according to his daughter's testimony. About 1 o'clock in the afternoon he drove away from his daughter's home, which was about three blocks from Emily Kaiser's home, and at about 2 o'clock he parked his car on a street near her house and quietly sat in it, facing toward the rear of the house, until about 3 o'clock. Then he suddenly backed up his car, and got out of it and ran across the street and down an alley to the rear of the Kaiser house and fired five shots at his wife and her mother and killed them both. A woman, who also resided in the Kaiser house, saw Devroy cross the yard at the rear of the house. She did not hear him say anything to the women or hear any talking, but when she heard the gunshots she heard the women scream. While Devroy was lying in the cornfield after shooting himself, he handed the note above quoted to one of the officers; and, while waiting for the ambulance, he admitted the shooting several times to the sheriff and other officers; and also admitted the shooting to the police inspector upon his arrival at the hospital. A sister of Devroy's wife testified that he told her, in the latter part of May, 1939, that he could get a tavern for about $4,000. "But I can't get it out of Lena [his wife]. I am going to shoot her if she don't give it to me;" that on July 22, 1939, he said, "I still didn't get settled and if I don't I will put her in the cemetery" [referring to his wife]; and that a couple of times before that the witness heard Devroy threaten to shoot his wife.

Taking these facts and circumstances into consideration, the record does not, under any reasonable view, admit of finding that the killing was in such heat of passion as must exist in order to reduce what would otherwise be murder to man-

slaughter in the third degree. To constitute such heat of passion there must be, as this court said in *Johnson v. State*, 129 Wis. 146, 160, 108 N. W. 55,—

"such mental disturbance, caused by a reasonable, adequate provocation as would ordinarily so overcome and dominate or suspend the exercise of the judgment of an ordinary man as to render his mind for the time being deaf to the voice of reason: make him incapable of forming and executing that distinct intent to take human life essential to murder in the first degree, and to cause him, uncontrollably, to act from the impelling force of the disturbing cause, rather than from any real wickedness of heart or cruelty or recklessness of disposition." *Ryan v. State*, 115 Wis. 488, 92 N. W. 271; *Carlone v. State*, 150 Wis. 38, 136 N. W. 153; *Balthazor v. State*, 207 Wis. 172, 183, 240 N. W. 776.

Although the conduct of his wife and Emily Kaiser and other events preceding and including the service of the papers in the divorce action, and Emily Kaiser's statements to Calmus in refusing to permit Devroy to speak to his wife on July 25, 1939, may have afforded some provocation, it cannot reasonably be held to have been adequate, in view of all the other facts and circumstances herein, to produce such mental disturbance as to so overcome and dominate or suspend the exercise of judgment on his part as to render his mind deaf to the voice of reason for the time being and make him incapable of forming and executing that distinct intent to take human life which is essential to murder in the first degree; and cause him uncontrollably to act from the impelling force of the disturbing cause. On the contrary, in view of the facts and circumstances herein, and particularly Devroy's apparently calm and deliberate conduct, and natural and rational conversation, while visiting with his daughter during the noon period, and his conduct while quietly sitting for about an hour in his automobile and watching the rear of the Kaiser premises, the record does not admit, under any reasonable view, of any other finding than that the killing was coolly and deliberately exe-

cuted, according to a preconceived design which was formed with no such heat of passion as to overcome, dominate, or suspend the exercise of his judgment or render his mind deaf to the voice of reason.

Likewise, in view of the threats previously made by Devroy on several occasions to kill his wife and his deliberately driving and parking his car where he could and did watch the rear of the Kaiser premises for an hour, and suddenly backing up the car and then running through the alley to the rear of the premises and firing five shots without any utterance, explanation, or excitement, or immediate provocation, the record does not reasonably admit of finding that the killing was "without a design to effect death." Consequently, as there was no reasonable ground, under any reasonable view of the evidence, for finding that the killing was "without a design to effect death," or that the killing was done in the heat of passion, the court rightly refused to submit to the jury the issue of manslaughter in the third degree.

On behalf of Devroy his counsel on this appeal contends that prejudicial error was committed by the attorneys who represented him on the trial in interposing a plea of insanity when that was neither warranted by the facts nor substantiated by proof. On this assignment of error, a discretionary reversal under sec. 251.09, Stats., is sought on the grounds that the plea was entered without any evidence to sustain it and Devroy was prejudicially affected thereby in respect to the real issue as to whether the killing was committed under strain of circumstances and heat of passion; and that in opposing the defense of insanity the state was permitted to ask expert witnesses long hypothetical questions with assumptions of facts, in answering which the witnesses gave testimony confined to the individual defendant that invaded to some extent the province of the jury. No error is assigned specifically, however, in respect to the form of the questions or the answers thereto. On the other hand, it is evident from the record that

Devroy's rights were properly safeguarded by the learned circuit judge; that he was vigorously defended by his attorneys on the trial; and that they were allowed wide latitude in introducing evidence which they believed would aid his defense. Although their evidence failed to establish the defense of insanity, the record does not admit of sustaining his present claim that because of the line of defense and strategy adopted and relied upon by his attorneys at the trial the other real issues in the case were not fully tried and were prejudicially affected by the attempt to prove insanity. Consequently there is no adequate basis for the granting of a new trial in the interests of justice.

The third assignment of error is that the court erred in admitting evidence of Devroy's confession. The evidence challenged thereby consists of solely the following answers by Devroy to questions asked by an assistant district attorney shortly after Devroy arrived at the hospital after he attempted suicide. "*Q.* You know your wife and mother-in-law were shot this afternoon. *A.* Yes. *Q.* Did you shoot them? *A.* Yes." Defendant objects to admission of these answers on the grounds that he was not warned of his constitutional rights; that the confession was taken when he was believed to be dying, and had just received the last sacraments, and was under the influence of morphine and in no condition to be talking or talked to; and that he was put under oath. It is not necessary, however, to pass upon these grounds because no prejudicial error can be deemed to have resulted from receiving in evidence the answers in question by which Devroy admitted that he shot his wife and mother-in-law. That fact was conclusively admitted by a stipulation during the trial; and, in addition, admissions made by Devroy to the same effect to the officers when he was arrested and also when he arrived at the hospital were established by competent, undisputed proof.

Devroy's fourth and fifth assignments of error are that the court erred in the wording of certain sentences in the instruction given to the jury. No purpose will be served here by quoting the sentences in question or discussing the nature of the error asserted. It suffices to state that the court's charge in its entirety discloses that when there are taken into consideration, in connection with the challenged portions of the instruction, the instructions in the sentences which immediately precede and follow the challenged portions there is no error or confusion whatever in the instructions.

*By the Court.*—Judgment affirmed.

MARTIN, J., took no part.