STATE, Respondent, vs. GOODCHILD, Appellant.

*January 13—February 7, 1956.*

The cause was submitted for the appellant on the briefs of *Earl Louis Goodchild, Jr., in pro. per.,* and for the respondent on the brief of the *Attorney General* and *William A. Platz,*

assistant attorney general, attorneys, and *John H. Bowers* of counsel.

GEHL, J. Defendant's assignments of error may be summarized as follows:

(1) The evidence does not sustain the conviction.

(2) His rights were violated when he was taken to the state crime laboratory on March 16th and there interrogated by a member of the staff.

(3) His arraignment was delayed unreasonably as a result of which he was placed in a state of "psychological turmoil," thus making certain statements given by him inadmissible upon the trial.

(4) At his preliminary hearing the state was permitted, over objection, to introduce in evidence state's Exhibit No. 1 (which was marked Exhibit No. 17 upon the trial), a written confession.

(5) Certain exhibits were improperly received in evidence. They are: Statement given by him to the chief of police and the district attorney on the evening of March 15, 1953, a tape recording of the same statement, a statement signed by the defendant on the evening of March 26, 1953, confessing the killing of his father and Becker (this is the same statement as is referred to in the assignment of error which we have designated as No. 3), a statement given by the defendant on March 26, 1953, at the state crime laboratory to the chief of police, and a typewritten transcript of the tape recording.

(6) The circuit court was without jurisdiction to try the petitioner.

(1) On the evening of March 13, 1953, Earl Goodchild, Sr., his father, and the defendant, left their apartment and visited a number of taverns. During the course of the evening they met Everett Becker, who joined them and together the three went to two other taverns in Becker's automobile, finally stopping at Fischerville, where they remained until

closing time at 1 a. m. When they left the last stop defendant got into the rear seat of Becker's car and fell asleep. When he awakened the car was parked in front of his apartment. His father and Becker had left the car.

At the trial he testified that when he awakened he took Becker's keys out of the car and went upstairs to his apartment. When he entered the apartment he told Becker that he had his keys and put them on a radio; that his father and Becker were in the kitchen sitting at a table appearing to be eating; that he told Becker that he had his keys and put them on the radio; that he went to the bedroom to lay his coat on the bed; that he does not remember what he did after he took off his coat and that the next thing he remembers is that he was sitting in Becker's car with a shotgun across his lap; he was frightened and went back to the apartment where he found both men lying on the kitchen floor; he shook his father and observed he was dead; he saw Becker on the floor mumbling something; he dragged him into the living room and went to a lower flat to arouse the people and to call a doctor. A doctor was called and he was placed under arrest.

After his arrest he made and signed various statements concerning the events of the night in question, which were not entirely consistent. On March 16, 1953, he was taken to the state crime laboratory at Madison, where he was interrogated. He became ill and requested that the interview be discontinued. He agreed to return for further examination at a later date.

On March 26, 1953, he was again taken to the state crime laboratory. After spending some time with a member of the staff of that place he told the chief of police of Two Rivers, who had taken him there, that he had done the shooting. Upon his return to Manitowoc he made a complete confession to the district attorney. After stating the facts the district attorney dictated the substance of the conversation to his secretary, who transcribed her notes. The transcript was

read to defendant and he signed it. The statement is as follows:

"My name is Earl Louis Goodchild, Jr. I am thirty-one years of age and live at 1912 Monroe street in the city of Two Rivers, Manitowoc county, Wisconsin. I give this statement of my own free will, without any threats or promises being made to me:

"On the evening of March 13, 1953, my father, Earl Goodchild, Sr., with whom I live at the above address, went out to see the fights on TV at one of the local taverns in Two Rivers. While in one of the taverns we met Everett Buddy Becker who worked at the same plant that my father does. We had motor trouble with our car so Becker took his car and the three of us left Jimmy's Bar in Becker's car and went out to Andy's Bar at Steiner's corner and had some glasses of beer and then went out to Joe Vulling's Bar at Fischerville where we had some more beer and stayed until closing. We got in Becker's car and he drove and we headed back for our house. On the way home I must have fallen asleep in the back seat because when I woke up the car was parked in front of our house and the other fellows were gone. I went upstairs but I don't know what time it was and as I got upstairs I think I said "Hello" but I don't remember if Becker or my father heard me or answered me. My father and Becker were in the kitchen, seated at the table, eating eggs and drinking coffee. I went from the living room into our bedroom where I left my topcoat. I don't remember if I took my suit coat off or not. I don't remember going into the gun case and the first thing I remember is putting a 22 cartridge in the rifle while I was walking out of the bedroom into the living room. I don't know why, but from the living room I shot Becker in the back of the head and saw him fall to the floor. Becker was seated at the kitchen table with his back to the living-room door and could not see me. My father, who was seated at the east end of the table, looked at me but I don't remember him saying anything nor do I think he moved while I reloaded the gun and shot him. I don't recall that we had any argument at any time during the evening nor did we have any argument after I got into

the house and before I shot them. At this time I don't know of any reason why I shot either of them."

He also admitted to a doctor at the Central State Hospital, where he had been taken for observation, that he had shot his father and Becker.

Two physicians, specialists in nervous and mental diseases, appointed by the court to examine him, testified that at the time of the killing he was not feeble-minded nor insane, and that he knew right from wrong and the nature and quality of his acts.

He was represented by counsel both at his preliminary hearing and throughout the trial.

We are convinced that there is ample testimony to sustain the conviction.

(2) If we understand the argument of defendant made under this assignment, it is that he was taken out of Manitowoc county where he had resided and the offense was committed and he was confined, to Dane county to be there "turned over to people who were not officers of his county, and that his arraignment was thereby delayed . . . for the purpose of coercing evidences [sic] meant to convict him," in violation of the Fourteenth amendment to the United States constitution; in essence, that the statements given by him (those referred to herein under the assignment which we have numbered 4) resulted from coercion and duress. The record discloses that he offered no objection to being taken to the state crime laboratory, that the statements were freely and voluntarily made, and that defendant's rights with respect thereto were adequately protected by the trial judge when he instructed the jury that:

"In order to entitle a statement against interest by a defendant to be considered by a jury, the statement must be the free and voluntary act of the defendant, which means that the statement must not have been obtained by any sort of threat

or coercion or by any sort of violence practiced upon the accused, or by any improper influences exercised upon him. A free and voluntary statement against interest, if made with deliberation and clearly proven is deserving of the highest credit because it is presumed to flow from the strongest sense of guilt. But a statement against interest forced from the mind by the influence of abuse, force, threats, coercion, inducement, or promises or of fear comes in so questionable a shape when it is to be considered as evidence of guilt, that no credit should be given to it.

"The burden of proving that statements against interest were voluntarily made and were not obtained by improper means, is upon the state, and you must be satisfied beyond a reasonable doubt that such statements were freely and voluntarily made and properly obtained before you can consider them. You are at liberty to accept or reject the whole or any part of any and all of the statements against interest accordingly as you are satisfied by the evidence that they or any part of them were made or obtained under proper or improper influences or conditions, and accordingly as you are satisfied by all of the evidence in the case that the same were voluntarily or involuntarily given. Considering the statements, of any of them or any part of them, whether they were voluntarily or involuntarily made, you may consider the age, education, experience, character, intelligence, and previous training and susceptibility of the accused to threats, violence, coercion, or other improper influences, if any such methods were used, all as shown by the evidence bearing on the subject."

(3) What we have said with respect to the assignment of error considered immediately above also applies to this assignment.

(4) The exhibit is a typewritten statement and as appears from the testimony given at the preliminary hearing, is a condensation of a confession made by the defendant to the district attorney in the presence of the chief of police of the city of Manitowoc. When it was offered in evidence at the preliminary hearing defendant's counsel objected to its re-

ceipt upon the ground that it had not been shown that it was defendant's full statement, that it had not been shown to have been made voluntarily, that it had not been shown to be a confession made by him, and that it was in fact dictated by the district attorney. The record shows that the statement is not a verbatim record of defendant's confession but it does show that it was made voluntarily after having been read to him, and that he signed it in the presence of the chief of police and a deputy sheriff of Manitowoc county. The record also shows that before the interview, which resulted in signing the statement, the defendant was advised of his rights. The magistrate did not err in receiving the statement in evidence.

(5) All of these exhibits were received without objection. If there was error in receiving them the defendant has, by his failure to object at the trial, waived his right. *State v. Hoffman* (1942), 240 Wis. 142, 2 N. W. (2d) 707; *Potman v. State* (1951), 259 Wis. 234, 47 N. W. (2d) 884. We should add that there is nothing in the record to suggest that the court erred in receiving them.

(6) Defendant does not indicate why he considers that the court was without jurisdiction to try him except to point again to the alleged errors which we have considered.

A thorough examination of the record discloses that defendant has had an eminently fair trial and that no error was committed by the court.

*By the Court.*—Judgment affirmed.