STATE, Respondent, vs. STORTECKY, Appellant.

*June 5—June 22, 1956.*

For the appellant there was a brief and oral argument by *Frank L. Nikolay* of Abbotsford.

For the respondent there was a brief by the *Attorney General* and *William A. Platz,* assistant attorney general, and *Raymond H. Scott,* district attorney of Taylor county, attorneys, and *John H. Bowers,* law examiner, of counsel, and oral argument by *Mr. Platz.*

STEINLE, J. On the evening of March 16, 1955, the defendant shot his wife, Julia Stortecky, in the leg and abdomen at their home on a farm in the town of Roosevelt in Taylor county. The wife died early on the following morning while on the operating table at the Victory Memorial Hospital at Stanley. Death was due to shock and loss of blood as a result of gunshot wound. Present at the time of the shooting was the nine-year-old son of the parties, Stanley Stortecky. Both father and son testified at the trial. The son was called as a witness for the state and the defendant testified in his own behalf.

The boy, Stanley, testified that when he returned home from school at about 4:30 p. m., on March 16, 1955, his mother and father were in the kitchen of the home. The parents were quarreling about the milk check,—the father indicating that he wished to cash it from then on. The boy greeted the father by kissing him. The mother dipped some chili from a pot on the stove into a bowl, and placed the

bowl on the kitchen table for the boy. While the boy was eating the food, the father pulled the chair in which he sat to the table, and the mother brought a bowl of chili and placed it before the father. He tasted it,—indicated that it was hot,—and shoved the bowl off the table. The bowl struck the mother, and then struck the stove, and broke into pieces when it fell to the floor. The father then asked the boy whether he wanted his mother killed. The boy made no reply. A .22 automatic Colt revolver lay on the table. The father picked up the gun and shot at the mother's feet several times as she moved around the room. Before firing the shots the father said to the mother "I am going to make you dance." The boy knew that the father had been drinking. While the mother was picking up a piece of the broken bowl, the father shot at it. He also fired shots toward the ceiling. The mother went to a corner of the room and said : "Please, please, don't shoot me." The father "went to pull the trigger to shoot my mother in the middle, but the gun clicked and the bullet jammed." The mother went to a chair and "said her prayers so he would not shoot her." The boy, at the request of the father, obtained some bullets from a shelf in the cupboard and gave them to the father. The father asked the mother for fifty cents. The mother gave him sixty cents. The father left the house (about 5 p. m.) and rode away in the car toward Lublin. The mother did chores in the barn, and later played checkers with the boy. Thereafter both watched a television program and while doing so the father returned (about 7:45 p. m.). In addressing the mother the father said "you have spoiled my happiness, I will spoil yours,—you won't buy me any cigarettes." He then kicked over the television set which was in the living room. He kicked the mother in the right leg. He shot at the mother's feet as she moved to the kitchen. When she sat down he shot and said "I would rather shoot you and stay the rest of my life in jail." Later he said "I have an itching

finger to pull the trigger." Thereafter he shot her in the leg and in the middle (abdomen).

The defendant, when testifying in his own behalf, stated that on the morning of March 16, 1955, he had done chores on the farm. There had been no quarrel between his wife and himself at the time. He planned to assist in the digging of a well at a place away from the farm, but it was too cold for his associate and himself to undertake the work. He drove his car to Lublin, which is about two and one-fourth miles from his home, and arrived there at about 9 a. m. He spent his time until about 4 p. m., in a tavern, and during the course of that period drank a quantity of beer. He ate nothing. He arrived home at about 4:30 p. m. He lay down for about five minutes but suffered from heartburn and got up and went to the kitchen and sat in a chair. Stanley came home from school. The defendant decided to go outdoors with the gun. He loaded the gun but did not leave the house. He tasted the chili which his wife served to him, and burned his mouth. He pushed the chili bowl from the table and it struck the stove. He said "it did not hit the wife, that he knew of." He stated that he did not remember firing the gun while at home at that time. He said "I was mad,—angry." He argued with the wife and asked for money which she gave to him. The wife was in the barn doing chores when he left at 5 p. m. He said that he was not fit to help with the chores that night. He left the gun at home. At Lublin he had three bottles of beer at a tavern. He purchased some cigarettes and Tums at a grocery store. He drove home but does not remember the time when he arrived there. He picked up the gun and placed it on the table. The television set was in operation. He said that he "told them to shut it off." "They didn't listen to me—I became angry—they drove me crazy—I don't like loud music—I got dazed—I jerked the aerial off—I kicked the television—I don't remember tipping it." He then sat in a chair and tried to get

a bullet out of the gun which had jammed while he was loading the gun before leaving for Lublin at 5 p. m. The wife was raving. After he got the bullet out he was careless. He thought the chamber was empty. He pulled the trigger,—a bullet was discharged—it went to his left. He said "I told them to shut up and get the hell out of here." For the purpose of scaring the wife he "shot toward her foot, pointing the gun toward the floor." The wife said "Ouch, you hit me in the leg." The defendant said "The third shot went off, I thought she was going to fall toward me, I didn't know whether she was going to sit down or what—I don't remember what happened—I was going to grab her, and that is when the third shot went off—I don't know how it went off even—I had the gun in my hand at the time—I had no intention of firing the gun—I don't know whether she hit my hand or what happened,—maybe she put her hand out and hit my hand, and I had my finger on the trigger." The wife said "Ouch, you have shot me in the side."

It is undisputed that the husband and the boy assisted the wife into the car and then started for the home of the wife's brother, Leon Staniec, which is three fourths of a mile or less from the Stortecky farm. There the defendant told Leon Staniec that he had shot his wife. The defendant, the wife, and the boy transferred to Leon's car and Leon drove them to the hospital at Stanley, a distance of about 24 miles. Leon testified that en route to the hospital the defendant told him that it was an accident, and also said "to take it easy 'we have got a lot of time.' " At the hospital the defendant expressed a willingness to donate blood for his wife. At the trial the boy testified that while he was with his father at the hospital, the father told him "to tell the cops it was an accident, that he was cleaning the gun and that it went off accidentally." The sheriff testified that at the hospital he overheard the defendant instruct the son to "tell the sheriff it was an accident or he might have to go to a reformatory."

The bullet which entered the abdomen of the deceased became lodged in the vertebral space between the fifth and sixth lumbar vertebra, having passed through soft tissue only. The death was a result of the wound caused thereby. The bullet which struck Mrs. Stortecky in the left leg entered and went through the muscular part at the calf of the leg. It does not appear from the evidence that this wound contributed to the death. A physician who attended Mrs. Stortecky at the hospital testified that she told him in the presence of the defendant that she was sitting in a chair when the gun went off, and that the defendant at the time when asked by the physician "how close were you?" answered, "about four feet."

The defendant made certain admissions to investigating officers concerning the shooting. Included were statements to an interrogator of the state crime laboratory at Madison. Testimony was admitted at the trial regarding such statements.

The court submitted for the jury's consideration the questions of "murder in the first degree" under sec. 340.02, Stats.; "murder in the second degree" under sec. 340.03; "manslaughter in the fourth degree" under sec. 340.26; and "not guilty." The court instructed the jury with reference to "excusable homicide" under the first specification of sec. 340.30. On behalf of the defendant, request was made to submit questions to the jury relating to "manslaughter in the first degree" under sec. 340.10; "manslaughter in the second degree" under sec. 340.14; "manslaughter in the third degree" under sec. 340.18; and "negligent homicide" under sec. 340.271 (3). The court ruled that the evidence did not in any reasonable view support a verdict of first, second, or third-degree manslaughter or negligent homicide, as would require submission of such questions. The defendant's motion for a new trial was based in part on claimed error respecting the declination to submit the questions requested, and in per-

mitting in evidence the admissions of the defendant obtained without prior advice to him of his right to counsel, and as to his right against self-incrimination. Reversal is sought here for such alleged errors.

It was the duty of the court to accurately give to the jury the law of whatever degree of felonious homicide the evidence tended to prove, and no other. *Terrill v. State* (1897), 95 Wis. 276, 290, 70 N. W. 356.

To justify a submittal of a lesser degree of homicide there must be some reasonable ground in the evidence, in the judgment of the court, for a conviction of the lesser offense. As was said in *Sweda v. State* (1932), 206 Wis. 617, 625, 240 N. W. 369:

"It was said by this court that to justify a conviction, and submittal for conviction of a lesser offense included within the greater, 'there must be some *reasonable ground* on the evidence, in the judgment of the court, for a conviction of the former and not of the latter.' In the final analysis of the evidence, the test to be applied, in determining whether lesser degrees of the offense charged are to be submitted on request, is whether in any reasonable view of the evidence there is reasonable ground on the evidence, in the judgment of the court, for a conviction of the lesser offense and not the greater. See *Hempton v. State,* 111 Wis. 127, 140, 86 N. W. 596; *Weisenbach v. State, supra; Krueger v. State,* 171 Wis. 566, 578, 177 N. W. 917; *Meyer v. State,* 176 Wis. 184, 187, 185 N. W. 520."

If the evidence in any reasonable view could support any of the lower degrees requested for submission, the refusal would be error, for which prejudice to the defendant would be undeniable. *Duthey v. State* (1907), 131 Wis. 178, 111 N. W. 222.

We shall first consider whether the evidence in any reasonable view admits of a finding that the defendant violated sec. 340.10, Stats., relating to manslaughter in the first degree. Sec. 340.10 provides:

"The killing of a human being, without a design to effect death, by the act, procurement, or culpable negligence of any other, while such other is engaged in the perpetration of any crime or misdemeanor not amounting to a felony, or in an attempt to perpetrate any such crime or misdemeanor, in cases where such killing would be murder at the common law, shall be deemed manslaughter in the first degree."

There is no evidence that the shot which entered the deceased's leg caused her death. It was the bullet that penetrated into her abdomen that killed her. Had the decedent died from the effects of the injury to her leg, and had she not been shot in the abdomen, it could reasonably be declared upon the basis of the husband's testimony, that since he pointed the gun toward the floor before he fired, and had no intention to shoot his wife, he was thereby engaged in the commission of a crime less than a felony, to wit, disorderly conduct or careless use of a firearm; and that although it must be assumed that he intended the natural consequences of his act, he would have been entitled to a submission of the offense of manslaughter in the first degree. However, the court and jury when determining the degree of the homicide involved, were not concerned with the shot that entered the wife's leg excepting in so far as the same was an incident or circumstance surrounding the firing of the bullet that entered the abdomen and which was fatal. The shots which entered the victim's leg and abdomen were not fired in rapid succession. There was an interval between the firing of the shots. Under the evidence these respective shooting incidents must be treated separately. The aiming of the gun at the floor which resulted in the shooting in the leg, if such aiming was done, was a completed act, and was not directly connected with the shooting of the bullet into the abdomen. In *Dillon v. State* (1909), 137 Wis. 655, 119 N. W. 352, it appears that there was some evidence to the effect that the defendant kicked the deceased before he shot him. Request was made for sub-

mission of manslaughter in the first degree on the basis that by such assault and battery the defendant was engaging in the commission of a misdemeanor connected with his shooting of the victim a short time thereafter. This court held that under such evidence a submission of manslaughter in the first degree was not required. The court said (p. 662):

". . . we think a fair construction of this testimony does not lead to the conclusion that the killing was done while the defendant was perpetrating a crime less than a felony, but that the assault referred to was a completed act before the pistol was discharged."

In the instant cause there is no evidence indicating that the wound in the abdomen resulted from a shot fired while the defendant was engaging in a misdemeanor. The bullet wound in the abdomen and the circumstances surrounding the firing of the shot which caused it, preclude any reasonable view that the defendant intended or was engaging in a misdemeanor at the time. The trial court properly denied the defendant's application to submit a verdict of manslaughter in the first degree.

We next consider defendant's contention that the court erred in refusing to submit to the jury verdicts of "manslaughter in the second degree" and "manslaughter in the third degree." The statutes relating to such offenses are as follows: Sec. 340.14, Stats., provides:

"MANSLAUGHTER, SECOND DEGREE. The killing of a human being, without design to effect death, in a heat of passion, but in a cruel and unusual manner, unless it be committed under such circumstances as to constitute excusable or justifiable homicide, shall be deemed manslaughter in the second degree."

Sec. 340.18, Stats., provides:

"MANSLAUGHTER, THIRD DEGREE. Any person who shall kill another in the heat of passion without a design to effect death, by a dangerous weapon, in any case except such where-

in the killing of another is herein declared to be justifiable or excusable, shall be deemed guilty of manslaughter in the third degree."

Offenses under these sections of the statutes are characterized by the taking of human life while the slayer is in "the heat of passion." It has long been the rule in this state that the heat of passion which will reduce what would otherwise be murder to manslaughter in the second or third degrees is such mental disturbance, caused by reasonable, adequate provocation, as would ordinarily so overcome and dominate or suspend the exercise of the judgment of an ordinary man as to render his mind for the time being deaf to the voice of reason; make him incapable of forming and executing that distinct intent to take human life essential to murder in the first degree; and to cause him, uncontrollably, to act from impelling force of the disturbing cause rather than from any real wickedness of heart or cruelty or recklessness of disposition. *Johnson v. State* (1906), 129 Wis. 146, 108 N. W. 55; *Duthey v. State* (1907), 131 Wis. 178, 183, 184, 111 N. W. 222; *Dillon v. State* (1909), 137 Wis. 655, 662, 666, 119 N. W. 352; *Carlone v. State* (1912), 150 Wis. 38, 41, 42, 136 N. W. 153; *Balthazor v. State* (1932), 207 Wis. 172, 183, 185, 240 N. W. 776; *Devroy v. State* (1942), 239 Wis. 466, 474, 1 N. W. (2d) 875.

With reference to the adequacy of the provocation essential as an element of heat of passion, this court in *Johnson v. State, supra* (p. 159), quoted with approval from 21 Am. & Eng. Ency. of Law (2d ed.), 177, the rule that:

" 'The provocation, in order to be sufficient in law, must be such as, naturally and instantly, to produce in the minds of persons, ordinarily constituted, the highest degree of exasperation, rage, anger, sudden resentment, or terror.' "

In *Carlone v. State, supra* (p. 41), this court held:

"It is not sufficient proof of heat of passion for the accused to merely testify that he was exceedingly angry or passionate

at the moment in question. Such testimony must be supplemented by proof of facts and circumstances showing such provocation as would ordinarily produce heat of passion. *Ryan v. State,* 115 Wis. 488, 92 N. W. 271; *Johnson v. State,* 129 Wis. 146, 108 N. W. 55. These circumstances are entirely wanting in the instant case. The quarrel which resulted in the homicide was a very ordinary dispute. . . . Petty disagreements of this kind cannot be settled with a rifle. Nor can a person in no personal danger and subjected to no extraordinary provocation have recourse to a lethal weapon and take human life and then mitigate the offense by his own statement of his causeless anger or passion."

In the case at bar it is considered that the defendant's mental disturbance was not produced by such provocation as reasonably would ordinarily cause a person's mind to be deaf to the voice of reason. The record indicates that there had been a family dispute as to the cashing of the milk check several hours before the fatal shooting. Shortly before such shooting the defendant became upset about the loud noise from the operation of the television set. He told the wife and son to shut it off. When they failed to comply with his request, and when the wife "drove him crazy" by "hollering and raving," he became "mad" and got "very angry" and jerked the aerial off and kicked the television cabinet. Such provocation and mental disturbance was far less than that indicated in *Devroy v. State, supra,* where this court upheld the trial court's declination to submit to the jury the issue of "manslaughter in the third degree" as requested.

In the light of the evidence, the trial court did not err in declining to submit questions relating to "manslaughter in the second degree" and "manslaughter in the third degree."

The defendant contends, too, that the court erred in refusing to submit the issue of "negligent homicide." Sec. 340.271 (3), Stats., provides:

"Any person who, by the operation or handling of a gun, pistol, or other firearm or of a bow and arrow in a careless,

reckless or negligent manner constituting or amounting to a high degree of negligence, but not wilfully or wantonly, shall cause the death of another, shall be deemed guilty of negligent homicide and shall be punished. . . ."

This section of the statutes is applicable in a situation where death is caused as a result of negligence greater than ordinary negligence, but less than gross negligence. A person under the influence of liquor who is careless to the extent that he thinks that the chamber of a revolver is empty when he pulls the trigger, and who at the time is in a "mad" frame of mind against his wife whom he shoots in the abdomen, can hardly be said to have been less than "grossly negligent." The court submitted the issue of "manslaughter in the fourth degree." Sec. 340.26, Stats., provides:

"340.26 [MANSLAUGHTER, FOURTH DEGREE.] Every other killing of a human being by the act, procurement, or gross negligence of another, except negligent homicide, where such killing is not justifiable or excusable, or is not declared in this chapter murder or manslaughter or some other degree, shall be deemed manslaughter in the fourth degree."

We find no error in the court's declination to submit the issue of "negligent homicide."

We reach now that assignment of error wherein the defendant maintains that the admissions were obtained from him without advice to him of his right to counsel, and without having been advised of his constitutional right against self-incrimination, and that in the absence of such advice or warning, the statements made by him were not voluntary and, therefore, were not admissible in evidence.

The admissions referred to concern answers to inquiries put to the defendant both before and after his arrest. The statements were not made under oath. With respect to some matters they are contradictory. The defendant did not admit premeditation, but his answers pertain to circumstances as to how the shooting took place. It is claimed that he was

pressed with questions in such manner and under such circumstances as to render his statements compulsory. The defendant relies on such authorities as *Bianchi v. State* (1919), 169 Wis. 75, 171 N. W. 639, and *Flamme v. State* (1920), 171 Wis. 501, 177 N. W. 596, wherein it was held that the circumstances indicated that the admissions were not given freely and voluntarily.

There is no duty upon officers of the law to advise the defendant of his right to counsel and to remain silent, and the failure to give such advice does not render a confession or admission inadmissible. As stated by Mr Justice HUGHES in *State v. Fransisco* (1950), 257 Wis. 247, 253, 43 N. W. (2d) 38:

"The constitution requires that law-enforcement officers conduct investigations fairly and with due regard for the accused's·rights. It does not, however, require that they advise those against whom they prefer charges to plead not guilty and *hire counsel*. If in the course of their investigation they fairly question a suspect and obtain an admission from him, it should be used in evidence. . . .

"A confession is not rendered inadmissible merely by the fact that when it was made persons in authority were present. 22 C. J. S., Criminal Law, p. 1431, sec. 817." (Emphasis supplied.)

The same principle applies to failure in advising the accused of the constitutional rights relating to self-incrimination. *Link v. State* (1935), 217 Wis. 582, 259 N. W. 428, 261 N. W. 416; *State v. Whatley* (1933), 210 Wis. 157, 245 N. W. 93.

The fact that a defendant is in custody, under arrest, and that officers are present when the statements are made, does not render the admissions incompetent in the absence of improper inducement. *State v. Fransisco, supra; Van Rite v. State* (1941), 237 Wis. 212, 215, 217, 295 N. W. 688.

The test to be applied in determining the admissibility of confessions or statements to officers of the law is whether

the same are testimonially trustworthy. In *State v. LaPean* (1945), 247 Wis. 302, 313, 314, 19 N. W. (2d) 289 (certiorari denied, 326 U. S. 801, 66 Sup. Ct. 486, 90 L. Ed. 488), this court said:

"If the confession in question was not freely and voluntarily made, and was induced by threats and promises, it is not admissible. *Pollack v. State* (1934), 215 Wis. 200, 253 N. W. 560, 254 N. W. 471; *Esterra v. State* (1928), 196 Wis. 104, 219 N. W. 349; *Flamme v. State* (1920), 171 Wis. 501, 177 N. W. 596; *Bianchi v. State* (1919), 169 Wis. 75, 171 N. W. 639.

" 'Whether a confession is voluntary or, in other words, testimonially worthy depends largely upon the facts of the particular case. In determining this question, factors which are proper to be considered include the sex, age, character, disposition, education, and previous training of accused, his mental qualities, his physical health, and his surroundings, as well as the nature, content, and import of the confession itself.' 22 C. J. S., Criminal Law, p. 1428, sec. 817, and cases there cited. . . .

" 'The principle upon which a confession is treated as sometimes inadmissible is that under certain conditions it becomes untrustworthy as testimony. . . .

" 'The principle, then, upon which a confession may be excluded is that it is, under certain conditions, testimonially untrustworthy. What circumstances may make it so, and what degree of untrustworthiness is sufficient, are further questions, but the essential feature is that the principle of exclusion is a testimonial one, analogous to the other principles which exclude narrations as untrustworthy. This theory, while developing different and inconsistent practical tests at the hands of various courts, seems to have been generally accepted as the underlying and fundamental principle since the first introduction of any doctrine about the inadmissibility of confessions.' 3 Wigmore, Evidence (3d ed.), p. 246, sec. 822.

"The only question is whether this confession was obtained by promises which induced him to make an untrue or untrustworthy confession. 'The question of the admissibility of the alleged confession is in the first instance for the court;

if there be doubt with respect to the fact that it was voluntary, then that question should be submitted to the jury with proper instructions.' *Pollack v. State, supra,* p. 217. The determination of the court is controlling unless it appears satisfactorily from the record that such determination was clearly against the evidence. *Connors v. State* (1897), 95 Wis. 77, 69 N. W. 981; *Roszczyniala v. State* (1905), 125 Wis. 414, 104 N. W. 113.''

In the case at bar, careful analysis of the statements made by the defendant to officers of the law indicates that the same were freely and voluntarily made without coercion, without promise, and without influence of hope or fear, and that the same were testimonially trustworthy. It is to be noted that with respect to the testimony of the interrogator at the crime laboratory concerning his conversation with the defendant, the court in the absence of the jury made a careful inquiry in accordance with the method prescribed in *Van Rite v. State, supra,* as to whether the statements were voluntary, and satisfied itself that the defendant was not under compulsion when he made the same. The situation is comparable to that in *State v. Goodchild* (1956), 272 Wis. 181, 74 N. W. (2d) 624, where it was held that the defendant's constitutional rights were not violated when he was taken to the state crime laboratory and there interrogated by a member of the staff. See also *State v. DeHart* (1943), 242 Wis. 562, 567, 568, 8 N. W. (2d) 360.

The defendant's admissions were competent. They were properly admitted in evidence.

Under the evidence it could only reasonably be considered that the bullet was discharged accidentally (a consideration submitted to the jury under the instructions relating to "excusable homicide" as provided in sec. 340.30, Stats.) ; or that it was fired with premeditated design to effect the death of the decedent (murder in the first degree) ; or that it was fired as an act imminently dangerous to the wife evincing a depraved mind, regardless of human life, without any

premeditated design to effect the death of deceased (murder in the second degree) ; or that it was fired as an act of gross negligence, not being excusable (manslaughter in the fourth degree). The jury found the defendant guilty of murder in the first degree. There is an abundance of evidence to sustain the jury's determination in such respect. The testimony of the minor son and that of the other witnesses presented by the state, clearly established guilt of "murder in the first degree." Had all of the evidence presented at the trial been only of the nature as that offered by the defendant, the jury could properly have rendered a verdict of murder in the first degree. In *Cupps v. State* (1904), 120 Wis. 504, 97 N. W. 210, 98 N. W. 546, the evidence indicated that the defendant shot the deceased in the vital part of her body, to wit, her neck. It was claimed on appeal that there was no evidence produced showing that the shot was fired with the intention to take human life requisite to the crime of murder in the first degree. This court with reference to such position, said (p. 513) :

"When it is made to appear in the prosecution of a case like this that the accused fired the shot, the weapon being aimed at a vital part of the body, and that death ensued as a natural and probable result, the presumption of fact as to intention to take human life, in the absence of any explanatory circumstance or evidence, makes a *prima facie* case for the prosecution. The state is not bound to go further and negative any probability that the occurrence was the result of accident, or that there were circumstances reducing the homicide below that of murder in the first degree, or excusing or justifying it altogether."

In *Cupps v. State, supra,* the court also said (p. 512) :

"The location of the wound indicates that it was inflicted with a pistol pointed at the woman's neck and probably slightly downward. . . . The location of the wound and the other circumstances strongly indicated that the wound was intentionally inflicted. It was in a vital part of the body, giving

rise to the familiar legal presumptions that whoever inflicted it intended to produce the result which followed, such result being a natural and probable consequence of the act. Add to that the fact that the woman exclaimed the instant before the shot was fired, 'My God, don't shoot me!' and exclaimed immediately after the discharge of the pistol, 'They have killed me, they have killed me!' or words to that effect, and we have a pretty strong showing that whoever fired the fatal shot did so intending to accomplish what in fact resulted. That satisfies all the essentials of murder in the first degree, though there may not have been any definite or considerable period of time between the formation of the design to kill and the effectuation thereof. It is sufficient to satisfy the statute if the person committing the homicide has, at the time of inflicting the fatal wound, a design to take human life, and inflicts such wound with the purpose of accomplishing such design, and that death ensues, there being no circumstance to render the homicide excusable or justifiable. *Hogan v. State,* 36 Wis. 226, 244; Id. 30 Wis. 428; *Perugi v. State,* 104 Wis. 230, 80 N. W. 593."

A thorough examination of the entire record reveals that the defendant had an eminently fair trial, that no error was committed by the court, and that justice has not miscarried.

*By the Court.*—Judgment and order affirmed.