BALTHAZOR, Plaintiff in error, vs. THE STATE, Defendant in error.

*January 15—February 9, 1932.*

*J. E. O'Brien* of Fond du Lac, for the plaintiff in error.

For the defendant in error there was a brief by *L. E. Gooding,* district attorney of Fond du Lac county, *R. W. Thiel,* assistant district attorney, the *Attorney General,* and *J. E. Messerschmidt,* assistant attorney general, and oral argument by *Mr. Gooding.*

ROSENBERRY, C. J.   The errors as assigned and argued raise five principal questions: (1) Did the court err in refusing to submit to the jury the question of whether or not the defendant was guilty of manslaughter in the third degree? (2) Did the court err in instructing the jury that if they returned a verdict of not guilty they would violate their oaths as jurors?   (3) Did the court by its instructions erroneously put upon the defendant the burden of proving beyond a reasonable doubt that he had not forfeited his liberty?   (4) Was the instruction, "But mere drunkenness never relieves from criminal responsibility acts involuntarily committed which but for the intoxication would constitute crime," prejudicial? (5) Did the court erroneously permit expert witnesses to testify without having included in their consideration all of the testimony relating to defendant's mental condition?

(1) Manslaughter in the third degree is defined as follows:

"Any person who shall kill another in the heat of passion without a design to effect death, by a dangerous weapon, in

any case except such wherein the killing of another is herein declared to be justifiable or excusable, shall be deemed guilty of manslaughter in the third degree." (Sec. 340.18.)

In *Johnson v. State,* 129 Wis. 146, 108 N. W. 55, it is said:

. . . "The heat of passion which will reduce what would otherwise be murder to manslaughter in the third degree, and which is specified inclusively or exclusively in the statutory definitions of other homicidal offenses, is such mental disturbance, caused by a reasonable, adequate provocation as would ordinarily so overcome and dominate or suspend the exercise of the judgment of an ordinary man as to render his mind for the time being deaf to the voice of reason: make him incapable of forming and executing that distinct intent to take human life essential to murder in the first degree, and to cause him, uncontrollably, to act from the impelling force of the disturbing cause, rather than from any real wickedness of heart or cruelty or recklessness of disposition." *Ryan v. State,* 115 Wis. 488, 92 N. W. 271; *Carlone v. State,* 150 Wis. 38, 136 N. W. 153; 13 Ruling Case Law, p. 786.

If in any reasonable view of the evidence the jury were warranted in finding the defendant guilty of manslaughter in the third degree, the court having been requested to submit that form of verdict, the denial of the request was error. *Sweda v. State,* 206 Wis. 617, 240 N. W. 369.

The facts have been stated fully and fairly. Neither counsel favored us with a statement of facts with reference to pages of the record, so that the statement as given is derived from a study of the record itself and comparisons made with the statement of facts presented by counsel.

We have examined the record in vain for evidence of anything in the mind of the defendant approaching heat of passion as defined in our law. Up to the time the defendant shot and killed Ruth Smith, outside of being somewhat quiet and depressed after the remark made by Albrecht and talking a little more loudly than usual, he appeared to every one who saw him to be normal. A perusal of the entire evi-

dence leaves one with the conviction that, for some reason best known to himself, he formed a settled conviction between the time Albrecht made the remark and the time he left his home on the night in question to kill Ruth Smith or Wallie Albrecht, else why did he take with him the loaded revolver. Whatever his purpose may have been, whether it was to kill or to coerce Ruth Smith, in forming it there was no element of heat of passion. It was cool, deliberate, executed according to a preconceived design, and carried out calmly and efficiently. His original plan may have been to use the revolver when Ruth Smith and Wallie Albrecht were together. Ruth Smith's refusal to accompany him may have hastened his action. It certainly was not a reasonable, adequate provocation which overcame and dominated or suspended the exercise of his judgment under the circumstances.

In *Duthey v. State,* 131 Wis. 178, 111 N. W. 222, the trial court refused, when requested to do so, to submit manslaughter in the third degree, and on appeal this was held error. It is the contention of the defendant that that case rules this. In that case the defendant, a man thirty-eight years of age, who had been married about eight years and had two children, killed his wife and was charged with murder in the first degree. It appears that she had persuaded him to give her $500. She used the money to leave the country with one Langreet, her paramour, taking her daughter with them. The defendant followed her, a partial reconciliation took place, and she returned to Superior, their home, but refused to live with him. The night before the killing the paramour returned, the wife and the paramour were seen together upon the streets, and defendant testified that they openly made fun of and ridiculed him. He saw them together the last time about five o'clock in the afternoon. Between seven and eight o'clock he shot one Blyenberg, whom he suspected of intimacy with his wife, and apparently in-

tended to shoot Langreet but he escaped. The defendant then went to the house where his wife was staying and shot her. He professed on the next day to have had no knowledge of the shooting. It was held that the jury under the circumstances of this case might properly have found the defendant guilty of manslaughter in the third degree. But in the *Duthey Case* there was adequate provocation. Taking a man's wife away from him, inducing her to procure $500 with which to escape, and taking the daughter away from the father and then taunting him publicly, are quite different things than a mere chance remark of one young man that he had been in the company of defendant's girl a year and a half before. The facts adduced to establish adequate provocation in the case at bar in no way parallel those in the *Duthey Case* with the single exception that in each case the defendant claimed to have no knowledge of the killing.

It is considered, therefore, that the court did not err in refusing to submit to the jury a verdict of manslaughter in the third degree.

(2) Near the beginning of his charge the court instructed the jury as follows:

"It appears without dispute that Ruth Smith came to her death at the time and place charged, by a bullet fired from a revolver in the hands of the defendant. There is nothing in the evidence to support an inference that the killing was either justifiable or excusable, as those terms are defined by our statutes. It follows that the person who killed her is necessarily guilty of some degree of homicide, unless that person was at the time of the killing insane."

The court then charged the jury in connection with a verdict of not guilty because insane, a verdict of guilty of murder in the first degree, a verdict of murder in the second degree, and then said:

"Four forms of verdict will be submitted to you: verdicts of guilty of murder in the first degree and second degree; not guilty because insane; and not guilty. It is not disputed

that the defendant shot and killed Ruth Smith, and I say to you that you will violate your oaths as jurors if you return this verdict."

It is conceded that in the last sentence the court clearly referred to the verdict of not guilty. The defendant complains of this and says that by so doing the court in effect directed the jury to return a verdict of murder in the first degree or murder in the second degree or a finding of insanity. This the defendant. says constitutes error. It is considered that the court correctly held that the homicide was neither excusable nor justifiable. There is not a single circumstance in the evidence that suggests either. If the defendant was sane he must therefore be guilty of some degree of homicide as the trial court said and it was not error for the court to so instruct the jury. The jury must have clearly understood from the instructions that it was within their power if they so chose to return a verdict of not guilty. The instruction complained of is not happily phrased. In *Schmidt v. State,* 159 Wis. 15, 149 N. W. 388, the following instruction was approved, under facts in this respect similar to those in the case at bar:

"The jury have the power, if they see fit, to acquit the defendant of all crime, but in case you should do so you would disregard the undisputed facts and the law applicable to this case."

This instruction was approved, Mr. Justice TIMLIN dissenting. He pointed out that it was equivalent to an instruction of the court to find the defendant guilty of some degree of homicide. This was held not to be error. Of course an instruction of this kind is not to be given except in clear cases, and it is desirable that the jury be told in plain, direct language that it is within their power to acquit the defendant if they choose to do so. It is not, where the circumstances warrant it, error for the court to so instruct. the jury.

(3) The instructions of the trial court cover thirteen type-written pages and are very full and complete and evince an effort on the part of the trial court to submit the case to the jury with the utmost fairness. After it had fully instructed the jury upon credibility of witnesses, reasonable doubt, murder in the first and second degree, not guilty because insane, the court delivered a homily upon the duty of the jury and the importance of its functions to society at large:

"We poor human beings are all subjected to the influence of sympathy. The plight of Alton Balthazor on trial here before you, incites our sympathy. But we should no more be moved by sympathy for him than by pity for Ruth Smith, who one moment stood strong, erect, confident of the years stretching peacefully out before her, and the next moment lay bleeding, helpless, doomed to silence and the grave, where she now rests and sleeps.

"This is not said to influence you or sway you from your line of duty. It is said to impress upon you the importance and solemnity of your duty. You owe a duty to the defendant to protect him in his right to liberty if it has been proved to you beyond a reasonable doubt that he has not forfeited that right. And you owe a duty to the State to see that its law for the protection of human life is enforced and vindicated. Your verdict is of such import, both to the defendant and to the public, that emotion of any kind should not be permitted to influence it to any degree, or enter at all into your consideration of the case. Do not entertain any false sentiments or any mawkish sentimentality. The case calls for cool, sound, and calm deliberation. Because of the remarks of one of counsel, I wish to add that your duty is only to ascertain the truth from the evidence, under these instructions, and to declare the truth by your verdict."

The sentence "You owe a duty to the defendant to protect him in his right to liberty if it has been proved to you beyond a reasonable doubt that he has not forfeited that right," is taken out of its context and is said to have placed the

burden upon the defendant of establishing his innocence beyond a reasonable doubt. As the sentence stands, it is no doubt an erroneous statement of the law. No one can read the sentence as it stands by itself and certainly no one can read it with the remainder of the instruction without understanding that it was not intended to be an instruction as to burden of proof but an attempt to impress upon the jury their duty to protect the defendant in the enjoyment of his rights which were elsewhere in the charge fully defined. The jury were over and over again instructed that it was their duty to acquit the defendant unless they were convinced of his guilt beyond a reasonable doubt. These instructions were given in connection with each degree of homicide submitted and in connection with the instruction as to the evidence relating to the defendant's good character, so that the jury could not have been misled by this inadvertent expression on the part of the trial court as to their duty to acquit the defendant unless his guilt was established beyond a reasonable doubt. The wording of the instruction is unfortunate, but it is so out of harmony with the entire tenor of the instructions given as it is in connection with the statement of the importance of the jury's functions in the case that it cannot be considered prejudicial. To hold an inadvertence of this kind reversible error would be to return to the day when convictions were set aside because of the failure to dot an "i" or cross a "t" in the indictment.

(4) The court instructed the jury as follows:

"A protracted course of indulgence in intoxicating liquor may, it is true, result in insanity; may produce a diseased mind, as distinguished from intoxication or drunkenness such as results from an excessive drinking of intoxicating liquor upon a single occasion. But mere drunkenness never relieves from criminal responsibility acts involuntarily committed which but for the intoxication would constitute crime. Where some specific intent is essential to make an act con-

.stitute a crime, or a particular degree of crime, if the one committing the act is so intoxicated that he is mentally incapable of forming that particular intent, then he is not guilty of the crime or the degree of crime to which the entertaining of that specific intent is essential. But otherwise intoxication does not excuse or relieve from criminal responsibility. One may not cloud his mind from indulgence in intoxicating liquor and thereby relieve himself from criminal responsibility for acts committed while under its influence; the law is not so impotent and nonsensical as to permit of that. If a man will drink intoxicating liquor to intoxication, he must stand criminally as well as civilly responsible for his acts committed while in such state, except, so far as, if at all, specific intent be involved which he is, from his intoxication, mentally incapable of forming."

In this instruction, of which we have given but a part, and which should be read as an entirety in order to get a true perspective, the court used the word "involuntarily" where he quite evidently meant "voluntarily." As it stands with reference to this case the instruction means nothing. Nobody claimed that the act was committed involuntarily and there is no evidence in the case to which the instruction as it stands could be applied. The use of the word "involuntarily" where the court evidently meant "voluntarily" can by no stretch of the imagination be prejudicial error in view of the instruction as a whole. It may be remarked generally that in the instructions there are many sentences which contain statements in negative form which would be much clearer if they were in direct, affirmative form. But the form of statement does not render the instruction erroneous.

(5) The court appointed three experts who testified as to the sanity of the defendant at the time of the trial from an examination which they made of the defendant on May 7th, four days before the trial. An expert was called to the stand and asked if he had made the examination, asked if he had heard all of the testimony during the trial, and from

his examination and from the testimony given in court he was then asked whether in his opinion defendant was sane or insane on March 19, 1931, the day of the homicide. This was objected to on the ground that the expert had not heard the testimony given on Monday, the first day of the trial. On Monday the testimony of Dr. Twohig, relating to the wounds inflicted upon Ruth Smith, and a part of the testimony of Edward Roble, who drove the defendant to Waupun and back, was taken while the witness was absent. The direct examination of Mr. Roble was not completed on Monday and he was thoroughly and exhaustively cross-examined upon all aspects of the case by counsel for defendant in the presence of the expert. An examination of the testimony given on Monday discloses that the doctor had before him in the testimony which he did hear, all of the testimony material upon the question of the sanity of the defendant. There was the further objection that it did not appear upon what facts the witness based or predicated his opinion. In response to the question of counsel the witness answered: "I am of the opinion that he (defendant) is sane." This method of examining an expert witness has one merit only—it saves counsel the labor of framing a hypothetical question. It has many demerits, one of which is made to appear very clearly in this case. It requires the expert to pass upon the credibility of witnesses. It appears in this case from the subsequent cross-examination of the expert that the conclusion that the defendant was sane at the time of the homicide resulted from the fact that he disbelieved the defendant's testimony as to his mental state from the time he left the filling station at Waupun until he regained consciousness about midnight in the jail at Fond du Lac. Upon cross-examination each of the experts testified that if defendant's testimony in that respect were true, he would then be of the opinion that the defendant was insane, and further that he disbelieved defendant's testimony in that respect because of

what he did and said between the time he left Waupun and the time of the homicide. It has been many times pointed out that to ask an expert to testify from all of the evidence given and received in the case is only proper where there are no contradictions in the evidence.

In *Bennett v. State,* 57 Wis. 69, 14 N. W. 112, it was held error to permit an expert to answer this question: "What, in your opinion, would all the facts as sworn to by the several witnesses, if true, indicate as to the mental condition of the prisoner at the time of the commission of the offense?" This was held erroneous because the evidence was voluminous, not entirely harmonious, and to some extent contradictory.

The question here propounded did not ask the witness to assume the truth of the testimony on the part of the State or the truth of the testimony given on the part of the defendant, but to base his opinion upon all of the evidence offered and received in the case. It is impossible for the jury to know upon what facts the expert bases his opinion when the expert is examined in this way. It is hardly necessary to point out that where there are conflicting theories in a case and evidence to support each theory, counsel in propounding a hypothetical question to an expert may select any hypothesis fairly supported by the evidence and call for the conclusion of the expert witness upon the basis of the facts stated in the hypothetical question. *Kiekhoefer v. Hidershide,* 113 Wis. 280, 89 N. W. 189. In that way the various theories in the case may be submitted to experts and their opinions had thereon because it is then left to the jury to decide what facts are established by the evidence and the jurors have the benefit of the expert's opinion upon the various theories of the case. Where the evidence given is not conflicting and is not so complicated or voluminous as to make a difference of understanding of material facts probable, an expert witness, who has heard it all, may be asked to predi-

cate his opinion thereon, assuming it to be true. Where these circumstances are not present the facts should be embodied in a hypothetical question. Whether in a given case the testimony is such as to render a hypothetical question necessary is a matter which rests largely in the sound discretion of the trial court. *Cornell v. State,* 104 Wis. 527, 80 N. W. 745. For a discussion of this matter and citation of authorities, see 1 Wigmore, Evidence (2d ed.) §§ 681, 682, and 683. See, also, note 39 L. R. A. 305.

However, in this case the error was cured by subsequent examination and cross-examination and it was made plain to the jurors by the testimony of the experts that if they believed the statements made by the defendant to the effect that he had no recollection of events from the time he left Waupun until midnight after the homicide, then in the opinion of the experts he was insane.

We find no prejudicial error in the record. A consideration of all of the facts leaves us with the conviction that the evidence would have fully sustained a conviction of murder in the first degree. Evidently the jury regarded his conduct on March 19th, especially his attempts to shoot his brother, his sister-in-law, his nephew, and his best friend, as evincing a depraved mind regardless of human life, and, giving him the benefit of the doubt, found him guilty of murder in the second degree. His conduct on that night certainly suggests that he was not sane at the time. That, however, was clearly a question for the jury. The jury having found him sane under the facts established by the evidence, there remained only the question of whether he was guilty of murder in the first degree or murder in the second degree.

*By the Court.*—Judgment affirmed.