SHARP, Appellant, v. MILWAUKEE & SUBURBAN TRANS-
. PORT CORPORATION, Respondent.

*November 28, 1962—January 8, 1963.*

For the appellant there was a brief by *Schneiderman &* *Strnad* of Milwaukee, and oral argument by *Burton A.* *Strnad.*

For the respondent there was a brief by *Kivett & Kasdorf,* attorneys, and *John M. Swietlik* of counsel, all of Milwaukee, and oral argument by *Mr. Swietlik.*

CURRIE, J.   This is the third appeal in this action, the two former appeals being reported in 11 Wis. (2d) 604, 106 N. W. (2d) 274, and 15 Wis. (2d) 268, 112 N. W. (2d) 597.

The alleged errors which plaintiff contends require the granting of a new trial are:

(1) The trial court made a statement of uncontroverted facts to the jury which omitted certain facts, which plaintiff claims are uncontroverted and should have been included.

(2) The trial court erroneously interpreted this court's statement, "that the door of the bus closed an inch or two above the elbow" to mean an inch or two above the uppermost portion of the elbow joint.

(3) The trial court erred in not sustaining plaintiff's objection to the hypothetical question put by defendant to Dr. Ansfield, its expert medical witness.

(4) The trial court erred in its instructions to the jury.

(5) The word "disability" should have been included in question (c) of the special verdict.

Plaintiff also requests that this court exercise its discretion by granting a new trial in the interest of justice.

### Court's Statement of Uncontroverted Facts.

At the commencement of the trial, the trial court, in the absence of the jury, informed counsel for the parties that the court proposed to make a statement to the jury as to how the accident happened. The court then read its proposed statement, which was as follows:

"In the case of *Sharp v. Milwaukee Transport Company*, the court is now indicating to counsel that the statement of facts as to how the accident happened will be presented to the jury by the court, and it reads as follows:

"On *voir dire* examination the court informed you that you were to try the issues of damages that arose out of an accident which occurred on January 30, 1958, in the 600 block of West Wisconsin avenue. You are to consider in this case the following facts as having been established:

"That on that date, January 30, 1958, Mrs. Gladys Affett Sharp was standing on the south side of the street in the 600 block on West Wisconsin avenue waiting for a bus. The bus stopped. Some people boarded the bus and Mrs. Sharp also attempted to board the bus in the usual and customary manner. She had a portion of one foot on the bottom step and her arm was past the doorway when the doors to the bus closed. The doors closed on her right arm an inch or two immediately above the elbow. She pulled her foot out, but the bus proceeded one to one and a half feet before she pulled out her arm.

"It is your duty to listen to all of the evidence in this case and upon that evidence and the court's instructions to determine the nature and extent of Mrs. Sharp's injuries and the reasonable compensation she would be entitled to for such injuries."

After reading this statement to counsel, the court then stated: "At this time, gentlemen, if you wish to make a record, you may do so." Counsel for plaintiff then moved, "I move that in the court's description of the manner in which

the accident happened it include that the plaintiff, to pull her arm out of the door of the bus, grabbed a pole with her left hand and pulled her arm out." The court denied this motion and one by defendant's counsel that also proposed an amendment to the statement. Thereafter, the jury was re-called and the court read to it the same statement of facts that it had previously read to counsel in the absence of the jury.

At the first trial plaintiff had testified that when her right arm was caught between the bus doors she grabbed a nearby post with her left hand and jerked her arm out. There was no mention of any twisting of the right arm in that trial. At the second trial, with an assist from her counsel, plaintiff did testify with respect to a twisting as follows:

"*Q.* Referring back a moment to the time when you pulled your right arm out of the bus, will you describe in a little more detail exactly how you pulled it out? *A.* Well, from what I can remember, it happened in such a split second, my arm was in the bus door and then as it moved along this post was there and I grabbed this post and pulled back.

"*Q.* Then, as you describe it now, you are sort of twisting around; is that right? *A.* Yes, twisting.

"*Q.* So at the time you sort of twisted around so you could grab the pole with your—*A.* Left hand."

Even this testimony is ambiguous as to whether her arm was twisted. Nevertheless, this testimony did not appear to be connected with the expert medical testimony given at the second trial. Thus, this court in its opinion in the second appeal (15 Wis. (2d) 272, 273) quoted a portion of plain-tiff's uncontroverted testimony given at the first trial as to how the accident happened. Her further testimony concern-ing her grabbing the pole with her left hand was not re-counted, apparently because her counsel did not stress this testimony in his argument and brief.

On this third appeal, plaintiff's counsel now urges that the incident of plaintiff's grabbing the pole with her left hand is

highly material. This is because of medical testimony at the third trial that a tennis-elbow condition can be caused by a blow to the elbow or by a "twisting injury with force applied to the ligaments about the elbow and muscles on the outer portion of the elbow. . . ." This testimony had no connection with the case, however, because of the absence in the record of any testimony that plaintiff's arm had been twisted during the course of the accident.

The trial court did not err by confining the statement of facts, which it read to the jury, to those stated in our opinion on the second appeal. Plaintiff was not thereby precluded from testifying as to details of how the accident occurred. The trial court pointed this out in its memorandum opinion on motions after verdict. If, however, plaintiff had testified that her right arm was twisted as a result of her claimed grabbing of a pole, the door would have been opened to defendant to contradict this testimony with that of two witnesses who were standing close by when the accident occurred. This is because of the absence of any testimony about twisting at the first trial.

### Location of Blow to Plaintiff's Elbow.

Plaintiff's counsel voiced no objection to the trial court's use of the phrase "an inch or two immediately above the elbow" in describing the place that the bus doors closed on plaintiff's arm. Plaintiff's counsel contends, however, that this distance of an inch or two is to be measured from the tip of the elbow; whereas the trial court, as appears from its memorandum opinion, concluded that the elbow was a joint and "that an inch or two above this joint can in nowise constitute an impact on a portion of the joint itself." During oral argument, defendant's counsel expressed a willingness that this measurement be made from the tip of the elbow as contended by plaintiff's counsel. Nevertheless, assuming that the tip of the elbow is the proper point from which to measure "an inch or two immediately above the elbow," we are unable

to find any instance during the course of the third trial in which this difference in points of measurement prejudiced plaintiff or specifically apprised the jury of the trial court's use of a different point of measurement.

Plaintiff's counsel contends that the trial court's interpretation of the point of measurement prejudiced plaintiff at four different points during the third trial as follows:

(1) Dr. Ansfield, defendant's expert medical witness, testified that if a tennis-elbow condition occurred by trauma, a blow had to occur where the muscle in the forearm attaches to the bony prominence on the outer side of the elbow. When the point at which this muscle attaches became inflamed, he stated, the result was a tennis-elbow condition. Defendant's counsel then asked the following question:

"*Q.* Now, Doctor, if a blow or trauma was on the upper side of the arm an inch or two above the elbow, do you have an opinion to a reasonable degree of medical certainty whether that type of blow or trauma would produce or cause a tennis-elbow condition?"

Plaintiff's counsel objected solely on the ground that the question did not "include all the relevant, material facts." This objection was overruled. Dr. Ansfield then answered that such a blow would not in his opinion produce a tennis-elbow condition. Defendant's counsel then put a long hypothetical question to Dr. Ansfield, which contained the following statement with reference to the point of impact: "The doors of the bus closed on her right arm about an inch or two inches above her elbow." Plaintiff's counsel again objected on the ground that the question did not include "all relevant, uncontroverted facts." This objection was also overruled. Dr. Ansfield then answered that he did have an opinion which was to a reasonable medical probability that plaintiff's symptoms of tennis elbow were attributable to her occupation.

We fail to perceive any error in the foregoing incident. The objections of counsel for plaintiff did not assert that any

fact was wrongly stated in the hypothetical questions with respect to the location of the blow to plaintiff's arm. Had such an objection been made, it would not have been well founded.

(2) Plaintiff's counsel questioned Dr. Ansfield during cross-examination as to his assumptions in connection with his prior testimony concerning the meaning of the phrase "an inch or two above the elbow." The pertinent questions and answers are as follows:

"*A*. I assumed an inch or two above the elbow is not precisely over this external epicondyle but rather above it. It was on the arm, not at the elbow.

"*Q*. Then you are assuming an inch or two above the external epicondyle; is that correct? *A*. If the elbow is in a bent position, yes.

"*Q*. What if it is in a straight position? A. In a straight position I think I showed that it would be just a little bit below the external epicondyle as the point of origin, but the elbow joint is not a pinpoint. We are talking about a rather vague area that hasn't got one straight line.

"*Q*. Well, Doctor, if the arm was straight then—I don't understand you—would you then be saying that the blow was on the elbow? *A*. No. Apparently the blow was on the arm, not on the elbow."

We fail to see how this second incident prejudiced plaintiff. Even if it did, the trial court in no way participated.

(3) During cross-examination, plaintiff's counsel attempted to put to Dr. Ansfield a long hypothetical question which contained this statement:

"I want you to assume that on January 30, 1958, between Sixth and Seventh and Wisconsin she was about to board a Transport Company bus when the door of the bus closed on her right elbow . . ."

Defendant's counsel objected to the question. The trial court sustained the objection without comment. Plaintiff's

counsel then inquired as to the grounds of the court's ruling. The court stated, "I will discuss the matter in chambers." The judge and counsel then retired to chambers and in the absence of the jury the court explained that it had sustained the objection because the question included the statement that the bus door closed on plaintiff's elbow whereas the undisputed fact, as stated by this court on the second appeal, was that the door closed one or two inches above the elbow. After returning to the courtroom, plaintiff's counsel rephrased the hypothetical question so as to state that the door "struck an inch or two above the elbow." Defendant's counsel interposed no objection to the question as rephrased.

Thus in this third incident no issue was raised with respect to whether the point one or two inches above the elbow was to be measured from the tip of the elbow or from the upper line of the elbow joint. The trial court correctly sustained defendant's objection to the first hypothetical question because it stated that the door closed on plaintiff's elbow.

(4) During the course of plaintiff's closing argument to the jury, defendant's counsel objected "to any argument by counsel that tends to show the blow was to the elbow rather than an inch or two above." The trial court ruled on the objection by stating,

"Just one moment. The jury will consider as having been definitely established the door closed on the right arm an inch or two immediately above the elbow. You may proceed."

In discussing this incident plaintiff's brief states,

"It was made clear to both jury and counsel that the court's reference was to the elbow joint rather than the point of the elbow."

We entirely disagree with the accuracy of this assertion.

After careful review of portions of the record relating to these four incidents, we can find no basis for a claim that

the trial court informed the jury that, in locating the point on plaintiff's arm "an inch or two immediately above her elbow," the measurement was to be made from the upper line of the elbow joint and not from the tip of the elbow.

*Defendant's Hypothetical Question to Dr. Ansfield.*

Plaintiff objected to defendant's principal hypothetical question put to Dr. Ansfield on the ground that it did not contain all relevant uncontroverted facts. Plaintiff's objection was overruled. Dr. Ansfield answered, on the basis of the assumed facts stated in this question, that in his opinion, to a reasonable medical probability, plaintiff's tennis-elbow condition was attributable to her job. Plaintiff claims this ruling constituted prejudicial error.

The facts omitted from the hypothetical question, which plaintiff contends should have been included, were: "That plaintiff had no symptoms prior to the accident, that she had weakness of grip, loss of sensation, that there was swelling about the elbow." We recently had occasion in *Kreyer v. Farmers' Co-Operative Lumber Co.,* ante, p. 67, 117 N. W. (2d) 646, to pass on the question of whether a hypothetical question put to an expert witness is improper if it omits uncontroverted facts which the opposite party contends are relevant. This question is discussed in footnote 3, page 78, to the opinion in the *Kreyer Case* and Wisconsin cases in point are cited. The conclusion is there stated that a hypothetical question need not state all the facts in evidence in the case "but only those needed to allow the expert to provide a correct answer on the theory advocated by the questioner's side of the case." See also *Kiekhoefer v. Hidershide* (1902), 113 Wis. 280, 290, 89 N. W. 189; *Schissler v. State* (1904), 122 Wis. 365, 374, 375, 99 N. W. 593; and *Balthazor v. State* (1932), 207 Wis. 172, 191, 240 N. W. 776. Among the cases considered in arriving at this conclusion was *Estate of Scherrer* (1943), 242 Wis. 211, 223, 7 N. W. (2d) 848,

wherein it was stated, "It is fundamental that a hypothetical question to a witness must include all the facts necessary to be considered in arriving at a correct answer."

The undisputed character of plaintiff's testimony that she had had no symptoms of tennis elbow prior to the accident did not require defendant to include such testimony in its hypothetical question, anymore than would the jury have to accept it as a verity. Plaintiff's counsel did exercise his right, however, to put a hypothetical question to the witness on cross-examination which did assume the fact that plaintiff had no symptoms of tennis elbow prior to the accident.

Pain in the region of the elbow, loss of sensation, and weakness of grip are symptoms of a tennis-elbow condition whether caused by occupation or trauma. Therefore, such symptoms were not needed in the hypothetical question to allow the witness to give a correct answer.

The symptom of swelling about the elbow after the accident stands in a different category. The evidence in the record does not disclose that this is in itself a symptom of tennis elbow. Dr. Bruno, the physician who examined and treated plaintiff the day after the accident, testified to the fact of swelling, and it is a verity in the case. This fact should have been included in defendant's hypothetical question. Nevertheless, we deem that any error in not including it was cured by plaintiff's cross-examination of Dr. Ansfield and by the trial court's instruction to the jury covering expert testimony.

The trial court, in instructing the jury, charged:

"You are instructed that the testimony of the physicians who testified in this case as to their opinions upon certain facts assumed in the questions put to them is subject to the same rules of credit or discredit as the testimony of other witnesses. Such opinions are not conclusive on the jury. The opinions neither establish nor tend to establish the truth of the facts upon which they are based. Whether the matters

assumed in the questions are true or false and have been proved is to be determined by you alone from all the facts and circumstances disclosed by the evidence. Such opinions are only pertinent insofar as the hypotheses, or assumed facts, upon which they are based are true and correct. If there should be any infirmity in the hypotheses, or assumed facts, then the infirmity attaches to the answer predicated thereon."

Plaintiff further attacks the hypothetical question put by defendant to Dr. Ansfield on the ground that it overstated the repetitive work which plaintiff performed. This is be- cause the question assumed that the number of times daily that plaintiff trimmed blueprints and plastic sheets with heavy scissors, lifted and carried five-to-ten-pound metal trays, and cut sheets of heavy plastic with a manual cutting machine with a stiff spring was the maximum number to which she testified rather than the average number. Nevertheless, plaintiff's counsel did not make a proper objection to the question so as to permit this attack on appeal. His objection was limited to the omission of facts, not the misstatement of facts.

### Instructions to Jury.

Plaintiff complains of two of the trial court's instructions to the jury.

The first of these read as follows:

"The four subdivisions in the verdict are damages questions, and they have already been read to you. By asking you to determine the amount of damages, *the court is not indicating, nor is it asking you to indicate, that the party whose damages are being determined is entitled to them.* In answer to the parts of the damage question be careful not to include or duplicate in any part amounts included in any other part answered by you, and nothing should be added by way of punishment or because of sympathy or resentment, or because the party from whom damages are sought is a corporation."
(Emphasis supplied.)

It is the italicized portion to which plaintiff objects. This portion of the instruction is taken from Wis J I—Civil, Part I, 1700 (b), which commences with this sentence, "You must answer the damage question no matter how you have answered any of the previous questions in the verdict." This particular uniform instruction was intended for use where the verdict contains other questions besides those relating to damages. Here the single question on the special verdict related solely to damages. One of the subparts of this question, however, related to damages for permanent injury; plaintiff was not entitled to any such damages if the jury determined that her tennis-elbow condition was solely occupational in origin. This being so, the giving of the italicized portion of the instruction in question was entirely proper. We do not deem the italicized portion open to the inference that in the court's opinion the tennis-elbow condition was not caused by the accident.

The second attacked instruction embodied the last paragraph of Wis J I—Civil, Part I, 1705, and all of Wis J I—Civil, Part I, 1740. The effect of this instruction was to place the burden of establishing both the permanency of the tennis-elbow condition and the extent of the disability that would result from this condition upon plaintiff. This was erroneous because this court had stated in its opinions on the two prior appeals that the tennis-elbow condition was permanent. Furthermore, the uncontroverted expert medical testimony on the third trial also established that the tennis-elbow condition was permanent.

While the uniform instructions embodied in Wis J I—Civil, Part I, are a valuable tool to the trial courts, charges to the jury sometimes require more than a compendium of extracts from these uniform instructions without varying their wording to fit the facts of the particular case at hand. In the instant case it would have been most appropriate had the trial court informed the jury that plaintiff's tennis-elbow

condition was permanent but that the burden of establishing both that the accident caused this condition, and the extent of disability flowing therefrom, was upon plaintiff.

It also would have been appropriate to frame the special verdict so as to include a special question inquiring whether the tennis-elbow condition was caused by the accident. The case of *Miller v. Kujak* (1958), 4 Wis. (2d) 80, 90 N. W. (2d) 137, presented a situation in which a special fact question in a verdict proved highly desirable in light of what had occurred during two prior trials of the same action as reported in *Jaster v. Miller* (1955), 269 Wis. 223, 69 N. W. (2d) 265, and *Miller v. Kujak* (1957), 274 Wis. 370, 80 N. W. (2d) 459, 81 N. W. (2d) 569.

Nevertheless, before this court will reverse for an erroneous instruction, it must be convinced that the instruction was prejudicial to the party who attacks it. Errors committed during the course of trial will not operate to disturb a judgment on appeal unless it appears pretty clearly that, had such errors not occurred, the result might probably have been more favorable to the party complaining. *Holtz v. Fogarty* (1955), 270 Wis. 647, 650, 72 N. W. (2d) 411. Although the question is close, we are not convinced that the instant erroneous instruction affected the jury's verdict. This is because the positive and undisputed medical testimony before the jury showed that the tennis-elbow condition is permanent. We doubt that the jury was misled by the instruction that placed the burden of proving this permanency upon plaintiff. Therefore, we conclude that the error was not prejudicial.

### Form of the Special Verdict.

Plaintiff further complains that it was error not to include the word "disability" in subpart (c) of the verdict. Subparts (b) and (c) were confined to damages sustained by plaintiff to the time of trial with (b) covering loss of earnings and (c) covering pain and suffering.

In *Kalish v. Milwaukee & S. T. Corp.* (1955), 268 Wis. 492, 497, 67 N. W. (2d) 868, we held that duplication might result if separate damage questions were submitted, one covering wage loss and the other disability. Wis J I—Civil, Part I, 1755, which is an instruction that refers to past pain and suffering to date of trial, does not include the word "disability." Where temporary disability has resulted apart from pain, suffering, and wage loss, some rewording of the question which is intended as the counterpart of subpart (c) of the instant verdict may be required. In the instant case, however, it would have been error to add the word "disability" to subpart (c) without in some way limiting it to expressly exclude wage loss.

### New Trial in the Interest of Justice.

It is only natural that this court would be somewhat reluctant to order a new trial in the interest of justice in a case in which three trials have already taken place. Nevertheless, it would be our duty to do so if we felt that justice had miscarried. In reviewing the record of this third trial we do not gain the impression that justice did miscarry.

The testimony of the expert medical witnesses for both parties was in agreement that a tennis-elbow condition usually is occupational in origin and rarely is caused by trauma. Dr. Kagen positively testified, based on the facts stated in plaintiff's hypothetical question, that in his opinion plaintiff's tennis-elbow condition was caused by the blow to the arm. On the other hand, Dr. Ansfield gave an equally positive opinion, based upon the facts stated in defendant's hypothetical question, that plaintiff's condition was occupational in origin. When plaintiff's counsel posed a hypothetical question on cross-examination in which he changed the facts assumed by defendant's question to be more in accord with plaintiff's theory, the doctor stated he was unable to give an opinion with respect to the cause of the tennis-elbow condi-

tion to a reasonable medical probability. Dr. Ansfield's testimony was to the effect that a tennis-elbow condition cannot be produced by a blow to the arm at a point one or two inches above the bony point of the elbow.

Tennis elbow derives its name from the fact that tennis players often develop this condition from the repetitive activity of firmly gripping their racquets while playing tennis. For over five years plaintiff's occupation required her to cut sheets of plastic with heavy scissors and a manual cutting machine both of which she operated with her right hand. In addition she frequently lifted heavy metal trays. While these activities were done with varying daily frequency, they were repeated over a long period of time.

In view of the foregoing, our conscience is not shocked by the jury's verdict. It is apparent that the jury determined either that the tennis-elbow condition was not caused by the accident but was occupational in origin, or that its cause was in sufficient doubt so as to preclude the jury's finding as a fact that it was produced by trauma. If the tennis-elbow condition be eliminated, then plaintiff's injuries received when the doors closed on her arm were minor and the damages awarded therefor were fair.

On the other hand, we likewise would be disinclined to disturb the verdict and direct a new trial if the jury had answered the subparts of the special verdict so as to find permanent disability and thus by implication that the tennis-elbow condition was caused by the accident. The strongest piece of evidence from plaintiff's standpoint was her own testimony that she had no symptoms of tennis elbow prior to the accident. The credibility of this testimony was clearly for the jury.

*By the Court.*—Judgment affirmed. Defendant's request for double costs is denied.

GORDON, J., took no part.